## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. ROBERT JUNIOR SMITH, Defendant. | No. 04-CR-2002-CJW-MAR **MEMORANDUM OPINION AND ORDER** |

### I. INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on June 29, 2020. (Docs. 157 & 158). On July 6, 2020, the government timely filed a brief in resistance. (Doc. 160). On July 8, 2020, defendant timely filed a reply. (Doc. 163). Oral argument was not requested and is not necessary. *See* LR 7(c). For the following reasons, the Court **grants** defendant's motion.

### II. RELEVANT BACKGROUND

On July 26, 2003, officers encountered J.H. and found that he was in possession of cocaine and cash. (Doc. 91, at 6). J.H. told officers he purchased the cocaine from defendant. (*Id.*). On January 6, 2004, officers searched defendant's residence and found $426 in cash and just under 17 grams of cocaine on defendant's person, $3,200 in defendant's wallet on the top shelf of a closet, and a box of plastic baggies in the bathroom. (*Id.*, at 6–7).

On January 21, 2004, a grand jury issued an Indictment charging defendant with possession with intent to distribute cocaine within 1,000 feet of a park in violation of Title 21, United States Code, Sections 841(b)(1)(B), 851, and 860 ("Count 1"). (Doc.

1). On January 26, 2004, officers arrested defendant. (Doc. 8). On January 27, 2004, defendant pleaded not guilty and was released on pretrial supervision. (Doc. 4). On September 14, 2004, defendant sold cocaine to a confidential informant while on pretrial release in this case. (Doc. 91, at 5, 7). On September 22, 2004, officers arrested defendant. (Doc. 63). That same day, a grand jury issued a Superseding Indictment adding a count of distribution of cocaine within 1,000 feet of a park while on pretrial release in violation of Sections 841(a)(1), 841(b)(1)(C), 851, and 860, as well as Title 18, United States Code, Section 3147(2) ("Count 2"). (Doc. 64). That same day, defendant pleaded not guilty and was detained. (Doc. 66). On October 22, 2014, a grand jury issued a Second Superseding Indictment to clarify the specific park at issue. (Doc. 80). On October 25, 2004, defendant again pleaded not guilty. (Doc. 84). On October 27, 2004, defendant changed his plea to guilty on Count 2 of the Second Superseding Indictment. (Doc. 86).

On January 25, 2005, the United States Probation Office ("USPO") filed defendant's presentence investigation report. (Doc. 91). Defendant was, at that time, 44 years old and residing in Iowa, where he was also born. (*Id.*, at 2, 22). Defendant came from a stable family. (*Id.*, at 22). He described his parents as close and loving. (*Id.*). None of his eleven siblings appeared to have criminal records. (*Id.*, at 23). Defendant graduated high school with a 1.20 grade point average, ranked 455 out of 459 students. (*Id.*, at 26). Defendant reported that he attended community college but no such records were found. (*Id.*). Until 2000, defendant held relatively steady employment, although he was regularly terminated for excessive absence or inadequate performance. (*Id.*, at 28). Since 2000, defendant had been unemployed following a work-related injury. (*Id.*). Defendant had two children and a close stepchild from his prior marriage, all of whom resided with him at times. (*Id.*, at 22). Defendant's second

marriage also ended in divorce. (*Id.*). Defendant was in a relationship with a woman he described as having significant mental health and substance abuse problems. (*Id.*).

Defendant was diagnosed with type 2 diabetes at age 28. (*Id.*, at 23). His diabetes was poorly controlled and at one point described as "end-stage." (*Id.*, at 23–24, 26). He took insulin and checked his blood sugar multiple times a day. (*Id.*). Defendant also had hepatitis C causing "liver problems." (*Id.*, at 24). He also had back issues, kidney issues, some neuropathy in his hands and feet, and had undergone heart tests due to chest discomfort. (*Id.*, at 24–25). A mass was also discovered in his vocal cords. (*Id.*, at 25). Defendant also had a history of heart attacks. (*Id.*). Defendant was diagnosed with depression and had a suspected suicidal incident in 2000, although he denies that he intended to harm himself. (*Id.*, at 26–27). Defendant noted he drank alcohol daily for most of his life but quit two years ago. (*Id.*, at 27). He reported he had tried many different illegal substances but had not used any in the last two years. (*Id.*).

Defendant's criminal history was significant. (*Id.*, at 11–19). At age 19, defendant was convicted of burglary and received a ten-year suspended prison sentence and five years on probation. (*Id.*, at 11). Despite being convicted of possession with intent to deliver marijuana, possessing cocaine, and a report from his girlfriend that he threatened her with a gun and stole her government aid check, defendant's probation was not revoked. (*Id.*, at 11–12). At age 25, defendant was twice convicted of delivery of cocaine and sentenced to 10 years imprisonment. (*Id.*, at 13). Two months later, his sentence was reconsidered, and he was placed on probation. (*Id.*). Despite being charged with attempted murder, assault while participating in a felony, possession of burglary tools, and attempted burglary, testing positive for cocaine, missing drug testing appointments, failing to comply with substance abuse treatment, failing to make payments towards court ordered obligations, and being found in contempt of court, defendant's probation was not revoked. (*Id.*, at 13–14). At age 31, defendant was convicted of

3

domestic abuse assault for straightening a coat hanger, heating it with a lighter, and striking his wife with it while he was supposed to be babysitting their children. (*Id.*, at 15). From ages 31 to 34, defendant was convicted of driving while intoxicated three time and driving while suspended once. (*Id.*, at 16–17). At age 36, defendant was convicted of assault for threatening a woman and her husband with a knife. (*Id.*, at 18). At age 38, defendant was convicted of driving while barred. (*Id.*). Defendant violated his probation by failing to maintain a suitable residence, failing to maintain contact with his probation officer, being arrested for obstruction of emergency communications and domestic abuse, testing positive for cocaine, and failing to report his whereabouts. (*Id.*, at 19). His probation was revoked, and defendant was sentenced to two years in prison which was then reduced to four months. (*Id.*, at 18). At age 40, defendant was convicted of assault for hitting his wife with a coat hanger and preventing her son from calling the police. (*Id.*, at 19). Although defendant was often incarcerated, it appears the longest period of incarceration he served prior to this offense was six months. (*Id.*, at 16–17). In summary, defendant had fourteen convictions, half of which were crimes he committed while on probation, another four while charges were pending. His convictions involved four crimes of violence and three felony drug offenses.

On April 1, 2005, the Court sentenced defendant. (Doc. 99). Defendant was in criminal history category V with a total offense level of 34, yielding an advisory guideline range of imprisonment of 235 to 293 months followed by ten years to life on supervised release. (Doc. 91, at 29). Defendant's offense, however, was subject to a mandatory minimum term of life imprisonment. (*Id.*). The Court sentenced defendant to life imprisonment followed by ten years on supervised release. (Doc. 100).

More than four years later, on July 14, 2009, defendant filed a pro se motion to depart downward in his sentence. (Doc. 118). On July 15, 2009, the Court denied his motion. (Doc. 119). On September 30, 2009, defendant filed a pro se motion to reduce

4

his sentence. (Doc. 120). On October 1, 2009, the Court denied defendant's motion. (Doc. 121). On October 19, 2009, defendant filed a pro se motion to vacate the Court's prior Order. (Doc. 122). On October 21, 2009, the Court denied defendant's motion. (Doc. 123). On February 22, 2012, the Court, on its own motion, found defendant was not eligible for sentence reduction in light of changes to the United States Sentencing Guidelines ("USSG"). (Doc. 124). On February 17, 2015, defendant filed a pro se motion to reduce his sentence. (Doc. 129). On June 12, 2015, the Court denied defendant's motion. (Doc. 131). On August 3, 2015, defendant appealed the Court's ruling. (Doc. 133). On August 24, 2015, the Eighth Circuit Court of Appeals affirmed. (Doc. 136). On January 13, 2017, defendant filed a pro se motion for a hearing on his release. (Doc. 139). On February 23, 2017, the Court denied defendant's motion. (Doc. 140). On February 26, 2019, defendant filed a pro se motion to reduce his sentence (Doc. 141) under the First Step Act, which the Court has not yet ruled on. Defendant is currently incarcerated at MCFP Springfield. (Doc. 158, at 2).

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

(i) extraordinary and compelling reasons warrant such a reduction; or

5

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the USSG section discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United*

*States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

### IV. DISCUSSION

#### A. Exhaustion of Administrative Remedies

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held that defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On March 8, 2020, defendant submitted his request for release to MCFP Springfield's warden. (Doc. 158–1). On April 6, 2020, the warden denied his request. (Doc. 158–2). On June 29, 2020, defendant filed his motion for release now before the Court. (Doc. 157).

Defendant asserts that, although COVID-19 is not mentioned in his request, it is mentioned in an attachment which is apparently missing. (Doc. 158, at 2). This Court has "previously held that a defendant need not mention COVID-19 in his administrative request for compassionate release if his request is based on health conditions and predates the COVID-19 pandemic." *United States v. Campbell*, No. CR03-4020-LTS, 2020 WL 3491569, at *4 (N.D. Iowa June 26, 2020) (citation omitted). So long as the defendant's request was denied by the BOP at a time which necessarily entailed consideration of the COVID-19 pandemic, the Court is unconcerned whether the request itself mentioned the

pandemic. *See United States v. Hughes*, 16-cr-2039-CJW-MAR-1 (N.D. Iowa June 23, 2020) (Doc. 146, at 8–9) ("Her second request, despite not mentioning the pandemic, would necessarily invoke consideration of COVID-19 given its timing."); *see also Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020) ("The COVID-19 pandemic merely accentuates [the defendant's] meritorious claims for release."). Here, defendant's March 8, 2020 request barely predates the official declaration of the COVID-19 pandemic on March 11, 2020. *Archived: WHO Timeline – COVID-19*, WHO, https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19. Given that the warden denied it on April 6, 2020, it is virtually certain the warden considered defendant's health conditions in light of the pandemic regardless of whether his request mentioned it. Although the government argues otherwise (Doc. 160, at 8–12), it is simply not realistic that the warden would fail to consider the effect of COVID-19 on an inmate's health, even if not specifically mentioned, given the sheer magnitude of the pandemic at its zenith in April 2020.

Thus, because 30 days have now elapsed since defendant submitted his request to the warden, the Court finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A) despite his request's probable failure to explicitly mention the pandemic.

### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 158, at 8–15). Defendant primarily relies on the opinion of Dr. Mehul Tejani, assistant professor of medicine at Emory School of Medicine. (Docs. 158–5 & 158–6). Dr. Tejani concluded, after extensively discussing defendant's medical records, that defendant's chronic kidney disease, compromised immune system, and type 2 diabetes all elevate defendant's risk of complications during the pandemic.

(Doc. 158-5, at 5). Dr. Tejani opines that "a fair argument" can also be made that defendant suffers from a serious heart condition. (*Id.*).

Numerous courts have held a defendant's relevant health conditions and the presence of COVID-19 within the BOP generally, or within the defendant's specific facility, together can constitute an extraordinary and compelling reason for compassionate release. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control ("CDC") lists nine categories of people who are at higher risk of severe illness and death from COVID-19: (1) people 65 years or older, (2) people living in a long-term care facility, (3) people with chronic lung disease or moderate to severe asthma, (4) people with a serious heart condition, (5) people with a compromised immune system, (6) severely obese people with a body mass index ("BMI") of 40 or above, (7) diabetic people, (8) people with chronic kidney disease undergoing dialysis, and (9) people with liver disease. *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. The latter seven categories apply to "[p]eople of all ages with underlying conditions, particularly if not well controlled[.]" *Id*.

There is no dispute that defendant suffers from at least two conditions which significantly increase his susceptibility to COVID-19; his chronic kidney disease and his type 2 diabetes. (Docs. 158, at 15; 160, at 15-16). Since as early as 2009, defendant has been on end stage renal dialysis ("ESRD") requiring dialysis three times a week for three to four hours each session. *See, e.g.*, (Doc. 158-3, at 11, 178). Defendant currently receives hemodialysis[1] and regular oral and intravenous medications to manage

---

[1] Hemodialysis uses an external machine called a dialyzer which removes blood from a person's body, filters it, and then returns it to the body. Essentially, it operates as an artificial kidney. *Hemodialysis*, National Institute of Diabetes and Digestive and Kidney Diseases,

his ESRD. *See, e.g.*, (*Id.*, at 327). Notably, defendant's hemodialysis is not administered through his arm as is standard but instead via a catheter in his chest, which is generally only used as a temporary method. *Hemodialysis*, NIDDK. This method is necessary because defendant previously had an artificial graft in his arm which became infected. (*Id.*). While receiving hemodialysis through his chest, defendant has endured line complications on three occasions which required his overnight transfer to a medical facility. (*Id.*). Dr. Tejani opines that this form of dialysis, which defendant has received for at least 18 months, is "not sustainable." (Doc. 158–5, at 2). Defendant has a 25-year history of type 2 diabetes. (Doc. 158–3, at 174). Although defendant's kidney treatments have somewhat stabilized his blood sugar levels, he still experiences significant swings in his measurements. *See, e.g.*, (*Id.*, at 217) (noting his blood sugar was at 214 on April 21, 2020, well into the diabetic range). Defendant also suffers nerve damage, neuropathy, foot ulcers, and foot injuries due to decreased blood flow to his feet caused by his diabetes. (*Id.*, at 48, 175, 378, 589). In short, these two conditions alone are serious and fulfill at least two of the CDC's risk categories.

Defendant also has a 25-year history of hypertension. (*Id.*, at 174). Although his dialysis helps control his blood pressure, he was treated on several occasions in 2020 for low blood pressure following treatment. *See, e.g.*, (*Id.*, at 24, 28, 66, 68, 71, 77). He was also diagnosed with left ventricular hypertrophy, i.e. damage to his heart from long-term hypertension. *See, e.g.*, (*Id.*, at 634) (noting "LVH"). Defendant also suffers from chronic polycythemia vera, i.e. an excess of red blood cells. (*Id.*, at 106). He has likely irreparable muscle loss in his forearm and hand, which the BOP described as somewhat

---

https://www.niddk.nih.gov/health-information/kidney-disease/kidney-failure/hemodialysis-#:~:text=Hemodialysis%20is%20a%20treatment%20to,and%20calcium%2C%20in%20your%20blood (hereinafter *Hemodialysis*, NIDDK).

10

Case 6:04-cr-02002-CJW-MAR   Document 164   Filed 07/10/20   Page 10 of 19

of a "claw hand" deformity.[2] (*Id.*, at 523, 589). His autoimmune deficiencies have resulted in conditions such as psoriasis and psoriatic arthritis which compounds his already limited fine motor skills. (*Id.*, at 8, 61, 388). He is on two different medications to control his neuropathy. (*Id.*, at 160). Due to weakness and numbness in his legs, he required the use of a cane in 2015 and then a wheelchair since 2017. (*Id.*, at 148). Recently, defendant has been able to ambulate minimally using a rolling walker. (*Id.*, at 589) ("[H]e's now using a Rolling walker to walk in the hallway up + back for about 10 minutes, he has not been able to this in about 5 to 6 yrs."). In the last 18 months alone, defendant has suffered a blood stream infection with a staph infection, a prostate and bladder infection, and various infections during dialysis. (*Id.*, at 180, 446).[3]

The government argues only that defendant's conditions are well-controlled and do not prevent him from providing self-care. (Doc. 160, at 14–15). Although many of his conditions are managed, defendant unquestionably requires constant medical care. His conditions have significantly limited his quality of life. Last year, for example, defendant was found to have "difficulty with fine motor tasks related to self care." (Doc. 158–3, at 575). It was a marked improvement for defendant to be able to tear a piece of paper and pick up small items off a table. (*Id.*, at 556). He required special training on how to put on his shoes and socks using a splint to pinch the sock in such a way as to not

---

[2] "Claw hand is a condition that causes curved or bent fingers. This makes the hand appear like the claw of an animal." *Claw Hand*, Icahn School of Medicine at Mount Sinai, https://www.mountsinai.org/health-library/symptoms/claw-hand. It can be caused by nerve damage in the arm. *Id.*

[3] Dr. Tejani also cites defendant's age of 60 (actually 59), which does not meet the CDC's risk category of persons over 65, and his weight, which is nowhere near the CDC's 40 BMI risk category. (Doc. 158, at 1); *see also* (Doc. 91, at 2, 4) (noting defendant's date of birth). Although the Court acknowledges these facts may impact defendant's health, it declines to significantly factor them into its analysis here because they fall outside of the established risk categories.

11

rupture his diabetic blisters or cause his toenail to fall off. (*Id.*, at 553, 557, 767). The record overwhelmingly shows defendant has various serious health conditions which make him more susceptible to COVID-19.

Currently, there is only one active case of COVID-19 at MCFP Springfield among the inmate population. *COVID-19*, BOP, https://www.bop.gov/coronavirus/. Although it appears the virus has not yet spread to other inmates, the presence of COVID-19 at the facility and throughout the BOP generally presents a significant risk to defendant given his vulnerabilities. *See, United States v. Oltmanns*, No. 09-CR-1016-CJW-MAR, 2020 WL 3453843, at *6 (N.D. Iowa June 24, 2020) (compiling cases). Indeed, COVID-19 is also present in every county in Iowa. Prisons, however, are uniquely susceptible to viral transmissions. *See United States v. Wilson*, No. 14-209-1, 2020 WL 1975082, at *2 (E.D. Penn. Apr. 24, 2020) ("Correctional and detention facilities present unique challenges for control of COVID-19 transmissions among incarcerated/detained persons . . . [because they] are at special risk of infection, given their living situations, and may also be less able to participate in proactive measures to keep themselves safe[.]") (internal quotation marks, citations, and original alterations omitted); *United States v. Park*, No. 16-cr-473 (RA), 2020 WL 1970603, at *2 (S.D.N.Y. Apr. 24, 2020) ("The nature of prisons—crowded, with shared sleeping spaces and common areas, and often with limited access to medical assistance and hygienic products—put those incarcerated inside a facility with an outbreak at heightened risk."). This is particularly true for this defendant who cannot fully isolate due to his need for ongoing medical treatment. It is true, as the government argues (Doc. 160, at 16–17), that defendant will need to seek continued treatment for his medical conditions in the community if released, such that he will not be able to fully isolate, increasing his risk of exposure. Nevertheless, he will not be confined and compelled to share common space with hundreds of other inmates. In short, defendant would be less likely to be exposed to COVID-19 if released.

Thus, the Court finds the combination of defendant's medical conditions and the status of COVID-19 at MCFP Springfield and in the BOP generally presents an extraordinary and compelling reason for release.

### C. *Section 3553(a) Factors and Danger to Community*

Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

This is a close call. Defendant's initial underlying offense is unremarkable. A small amount of cocaine and cash were discovered in his home along with a box of plastic baggies. Defendant sold cocaine to one other known individual near a park. This fairly benign offense, however, is aggravated by defendant's continued sale of cocaine near a park while on pretrial release. Although defendant abused alcohol, he only used cocaine himself a handful of times and, according to him, stopped using all illegal substances four years prior to his offense. He had no significant mental health history or issues during his upbringing mitigating his criminal conduct. His performance as a student and employee were both poor, although his medical issues mitigate this to some degree. Defendant had a substantial, troubling, and undeterred criminal history which was often

13

Case 6:04-cr-02002-CJW-MAR   Document 164   Filed 07/10/20   Page 13 of 19

characterized by excessive violence and abysmal performance while on probation or parole. His only prior drug offenses, however, occurred fifteen years prior to the instant offense. Defendant was convicted once of possession with intent to deliver marijuana in 1982 at age 21 and twice of possession with intent to deliver cocaine in February of 1986 at age 25. (Doc. 91, at 12–14). Despite his criminal history, defendant never spent more than a handful of months at a time in prison prior to the instant offense.

Many of the aggravating facts at issue here, however, occurred a decade and a half ago. Defendant earned his GED during his first year of incarceration. (Doc. 158–7, at 1). He completed drug treatment in 2009 and 2010. (*Id.*, at 2). Since then, he has taken a significant number of courses, notably 23 in 2019 and 2020 alone. (*Id.*). His disciplinary incidents have been few, far between, and minor. In 2007 and 2008, he was disciplined for phone abuse and gambling. (Doc. 158–8, at 1–2). In 2012, defendant was reported for possession of an unauthorized item. (*Id.*, at 1). His most recent violation occurred in 2015 for possessing a dangerous weapon and assault without serious injury for "fighting" another inmate over a "bag of pork rinds." (*Id.*). Overall, his performance while incarcerated, despite his medical conditions, is promising. Defendant also has a suitable release plan with his wife and 17-year-old daughter. (Doc. 158–9).[4] Defendant's wife is a nurse's aid and there are no guns or felons in the home. (*Id.*). Although defendant has a flawed past, he has taken significant steps over the last 16 years to rehabilitate himself despite staring down a life sentence and despite having multiple chronic medical conditions.

---

[4] The Court is concerned that defendant's wife was a victim of one of defendant's prior alcohol-fueled assault convictions. (Doc. 91, at 15). Because defendant is in significantly worse physical shape than he was in 1992 and his conduct, including alcohol consumption, will be monitored and controlled while he is on supervised release over the next decade, the Court finds this concern mitigated.

Importantly, if defendant were sentenced today, he would not be subject to a mandatory minimum sentence of life imprisonment. *See* 21 U.S.C. § 841(a). Because none of his three prior drug-related convictions would qualify as a serious drug offense, he would not even be subject to a 25-year mandatory minimum sentence. *See id*. Defendant's advisory guideline range would be approximately 130 to 162 months' imprisonment. His criminal history and the aggravating factors at issue, however, would warrant a sentence at least at the top of the guideline range, 13.5 years. If the Court imposed the maximum consecutive sentence of ten years for defendant's commission of an offense while on pretrial release, his sentencing guidelines range would be 250 to 282 months. Defendant has now been incarcerated for 189 months, approximately 16 years, equivalent to a 222-month sentence with good time.

Other courts have granted compassionate release to defendants serving a term of life imprisonment for drug-related offenses due to, among other things, the defendant's deteriorating health, the defendant's improvement while incarcerated, and changes in the sentencing guidelines. *See, e.g.*, *United States v. Sanchez*, No. 95-00421-CR-COOKE, 2020 WL 3581631 (S.D. Fla. Apr. 27, 2020) (granting release to a defendant sentenced to life in 1995 for marijuana-related offenses due to his age, heart conditions, and chronic kidney disease and the sufficiency of his lengthy term of incarceration); *United States v. Hope*, No. 90-cr-06108-KMW-2, 2020 WL 2477523 (S.D. Fla. Apr. 10, 2020) (granting release to a defendant sentenced to life in 1991 for cocaine-related offenses because his life sentence was no longer mandatory, he had a serious medical issue, and he performed well while incarcerated);[5] *United States v. Plunk*, No. 3:94-cr-00036-TMB (D. Alaska Apr. 9, 2020) (granting release to a defendant sentenced to life in 1994 for cocaine-

---

[5] The court in *United States v. Hope* declined to deny release based on the defendant's earlier repeated requests for release. 2020 WL 2477523, at *4. Here, the Court similarly declines to hold defendant's reasonable self-advocacy against him.

15

related offenses due to his age and the sufficiency of his lengthy term of incarceration); *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2020) (granting release to a defendant sentenced to life in 1994 for heroin-related offenses due to his significant rehabilitation); *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) (granting release pre-COVID-19 to a defendant sentenced to life in 1991 for conspiracy to distribute cocaine due to his age, changes in the sentencing guidelines, and his improvement while incarcerated); *United States v. Spears*, No. 3:98-cr-0208-SI-22, 2019 WL 5190877 (D. Or. Oct. 15, 2019) (granting release pre-COVID-19 to a defendant sentenced to life in 2001 for cocaine-related offenses due to his age, diabetes, cancer, and chronic kidney disease as well as the remoteness of his violent criminal history and physical inability to present a danger to public); *United States v. Wong*, No. 93-CR-1340 (RJD), 2019 WL 3428504, at *4 (E.D.N.Y. July 30, 2019) ("Mr. Wong has already served 26 years of his life sentence, the last three of which have been spent in medical purgatory. . . . At this stage, to require Mr. Wong to serve out the rest of his life sentence would be 'greater than necessary to serve the purposes' of 18 U.S.C. § 3553(a)(2)."); *United States v. Bellamy*, No. 15-165(8) (JRT/LIB), 2019 WL 3340699, at *6–7 (D. Minn. July 25, 2019) ("While Bellamy does have a significant criminal history, . . . all of his violent offenses are more than 28 years old [and he] has already served a significant portion of his [life] sentence [while in] deteriorating health."); *United States v. Cantu-Rivera*, No. H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) (granting release pre-COVID-19 to a defendant sentenced to life in 1990 for cocaine-related offenses due to his deteriorating health, rehabilitation while incarcerated, and the sufficiency of his already lengthy term of incarceration); *United States v. McGraw*, No. 2:02-cr-00018-LJM-CMM, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019) ("Mr. McGraw has served much of his [life]

16

sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served by most inmates.").

The Court acknowledges, however, that some courts have denied release despite a life-term defendant's poor health. *See, e.g.*, *United States v. Lika*, No. 84-CR-499 (CS), 2020 WL 2766049 (S.D.N.Y. May 28, 2020) (denying release to a defendant sentenced to life for heroin and murder-related offenses despite his illness due to the seriousness of the offense); *United States v. Araña*, No. 2:95-cr-80272-LJM-13, 2020 WL 2214232 (E.D. Mich. May 7, 2020) (denying release to a defendant sentenced to life for drug and murder-related offenses despite his illness); *United States v. Logan*, No. 1:96-CR-20-TBR, 2020 WL 730879 (W.D. Ky. Feb. 13, 2020) (denying release to a defendant sentenced to life for committing arson at a hotel which resulted in the death of four people despite his illness due to the seriousness of the offense). These cases are distinguishable from defendant's offense, however, because the crimes of conviction involved murders. Although, as noted, defendant's criminal history involves violence, his crime of conviction did not and he has not murdered anyone.

This Court recently denied compassionate release to an inmate serving a life term of imprisonment in *United States v. Green*. (06-CR-53-CJW-MAR-1 (N.D. Iowa July 10, 2020) (Doc. 95)). There, the defendant also had serious health issues warranting release including type 2 diabetes, vascular problems, chronic respiratory failure, severe obesity, and chronic pain. (*Id.*, at 6). Release was not appropriate, however, under the 3553(a) factors. The defendant had seven prior cocaine-related offenses which spanned most of his life, frequent violations while on probation or parole, no employment history, no mitigating upbringing, no mental health issues, and no personal drug addiction. (*Id.*, at 8). During his 14 years of incarceration, that defendant did not show significant improvement. (*Id.*). He had 13 disciplinary reports with violations as recently as the last year available, many of which involved fighting. (*Id.*). Notably, the defendant had,

17

on several occasions, diverted and hoarded pain medication, which indicated to the Court that he continued to mismanage drugs. (*Id.*, at 8–10). Defendant had also taken very few educational courses while incarcerated. (*Id.*, at 9). There, the defendant's physical condition was not quite as dire, his drug-related criminal history was more substantial, and his performance while incarcerated was significantly worse than the facts before the Court here.

Under the 3553(a) factors, 16 years of incarceration has sufficiently reflected the seriousness of defendant's offense, promoted respect for the law, and provided just punishment, particularly in light of defendant's lack of significant prior incarceration. Considering defendant's advisory guideline range for sentencing as it would be calculated today, the term of incarceration defendant has already served satisfies the goals of sentencing. Although defendant's history includes significant violence, it is highly unlikely that he presents any threat to the public given his current medical conditions. Unlike in *Green*, defendant has shown improvement over his term of incarceration. He has done so despite the absence of a promise of release. A brief period of home confinement and defendant's remaining ten-year term of supervised release will be sufficient to deter him from any further criminal conduct, and provide a means of protecting the public should defendant return to drug dealing or violent crime.

Thus, weighing all the factors under Section 3553(a), the Court finds release appropriate in light of defendant's serious health conditions during the pandemic.

## V. CONCLUSION

For these reasons, defendant's Motion for Compassionate Release (Doc. 157) is **granted**. Defendant's sentence is **reduced** to **time served as of August 10, 2020**. Upon release, defendant shall be placed on **home confinement** for **one year** as part of his supervised release. Defendant shall be responsible for the **costs** of such home confinement. All other conditions of defendant's Judgment shall remain the same. (Doc.

18

Case 6:04-cr-02002-CJW-MAR   Document 164   Filed 07/10/20   Page 18 of 19

100). The Clerk of Court is **directed** to provide a copy of this Order to the USPO and MCFP Springfield.[6]

    **IT IS SO ORDERED** this 10th day of July, 2020.

                                                    C.J. Williams
                                                    United States District Judge
                                                   Northern District of Iowa

---

[6] In light of this Order, defendant's outstanding request for a sentencing reduction is **denied as moot**. (Doc. 141).

19

Case 6:04-cr-02002-CJW-MAR   Document 164   Filed 07/10/20   Page 19 of 19